Argument next in number 2008, 1408 N. Re. Byerly. If we can give the council a chance to clear their area here. We can begin when you are ready. Good morning. Here, the PTO legally erred by failing to make a prima facie case of obviousness. The claims require a specific wicking index, a limitation that the prior art fails to teach or suggest. Wicking index refers to the ability of the SAM itself to wick fluid away from the insult. What if it's inherent? It's not inherent, Your Honor, because none of Kallenberger, the prior art SAMs, meet Byerly's claims. And contrary to the PTO's assumption that all compounds within a chemical class have the same properties, they simply do not. Because chemical SAMs depend on how they're produced, the cross-linkers in the SAMs, and the coatings. And they may be in the same chemical class, but the way they're produced and these different cross-linkers and coatings mean that they have different chemical qualities. And you can see that in Table 1 of Byerly's application. But you only point in your briefs at certain parts of Table 1. And I think that what the PTO argued, if I remember right, is that other portions of Table 1 show the fact that they do. Right? Isn't that what I understood them to argue? First of all, Your Honor, for inherency, the prior art must necessarily possess the claimed characteristics. And the PTO has not shown, because it's not there, that any of the SAMs in Kallenberger or the prior art have the claimed characteristics in Byerly. Whose burden is it? I want to make sure I understand this right. Didn't the PTO, at one point, kick this back to Byerly and say, establish, give us proof, show us examples? Was it inappropriate for them to do that? Is that your argument in the first instance? They shouldn't have required Byerly to do that, but rather had to. I mean, the PTO doesn't conduct experiments. They can't conduct experiments. We couldn't want them to conduct experiments. So, what do we do? Your Honor, the answer is twofold. First, the PTO improperly found a prima facie case and kicked it back. And secondly… You're saying only if they create a prima facie case can they kick it back for you all to have the opportunity to show what's wrong with what they've articulated? Yes, Your Honor. Under Oedeker, it says if the PTO fails to make a prima facie case, then the applicant is entitled to a patent as a matter of law. Here, the PTO failed to find the wicking index limitation. In fact, in the Board's original decision, they did not even address the wicking index limitation. However, in the rehearing decision, they simply said that Byerly's claims do not patently distinguish over the prior art, with no further discussion. However, so, our argument is they did not make a proper prima facie case. And we also make the same argument with respect to… that some of these disclosures will have a wicking index that falls into 10 or more, or 10, exactly 10, I don't remember. It cannot be inherently present because none of the test results in Kellenberger match the claim limitations. But, I think what the… didn't the PTO suggest it says, okay, Kellenberger says AUL of greater than 24. Byerly says AUL of greater than 17. PSI in Kellenberger of 0.3. Byerly, 0.57. Certainly, it's not identical, but you have certainly overlap in the AUL range. And, I mean, pressure is just, right, how big a baby butt putting pressure on it, right? How much pressure do you get when the baby sits down on it? And, clearly, different… while there are different pressures, I imagine the wicking index would probably be extrapolatable from those different pressures. First, Your Honor, the wicking index, as shown in Table 1 of Byerly, is not extrapolatable. And, you know that from looking at the specific examples we pointed out in our gray brief at Page 6. Turning back to Kellenberger, the PTO cherry-picks these numbers for AUL and separates them from pressure, which you just can't do. For example, it says that Byerly… or Kellenberger teaches 24, 27, 29, 32 AUL, but it doesn't tell you what that pressure is. It teaches those high AULs at a pressure of 0.30 PSI. If you look at… No, but don't they have a line in… hold on, don't they have a line that says… I remember… I seem to remember, and maybe I'm wrong, a line in Kellenberger that suggests that these would also be applicable at higher pressures. Is your… am I misremembering that? I think you might be remembering a line that says… a line that says that they'd be applicable at higher percentages of SAM. Oh, maybe that's not it. And we can address that, too, if you like. Did Kellenberger measure the quantity of fluid wick and the ability of SAM to conduct fluid? Yes, Kellenberger did, and Kellenberger was… There's a specific wicking index, but isn't that part of the way to a wicking index? Well, it's an entirely different way to wick fluid, Your Honor. The prior art was obsessed with wicking fluid around the SAM, and that's what's so neat about this invention. The prior art was so concerned that the superabsorbent material would expand and block the insult from getting to other areas of the absorbent composite. But Beyerle developed a way to find SAMs that wick themselves. A way to find SAM. We're on the same page, guys. This is the core, for me, of this case. What exactly did Beyerle invent? Did Beyerle invent a method of determining what SAMs would be effective in this kind of structure? Isn't that really the core of what you're saying that Beyerle invented? I think she did more than that. She did more than that. She did invent the test, but she also discovered that some SAMs wick well. Well, but so what? If she discovered that, she's claiming the composite. If the composite, if she's not creating a new composite, the fact that she's determining new properties, perhaps, of composites that are well known could presumably be claimed in a different way, but it can't be claimed as part of the composite itself, can it? There's nothing wrong with the way that this is claimed. There's nothing wrong in the sense that it's okay to claim products, but the question is the combination of what she brought that was new, which is, I really think, ultimately the wicking index and some measurements at different points on the curve from where Kellenberg measured, but I don't see how that is a contribution of a new absorbent composite. It's a contribution of a combination of the ability to determine what absorbent composites will wick well and allow you to use the SAM itself to get the liquid away from the insult, and also by using this wicking index and locating these SAMs, she was also able to have a higher pressure, and keep in mind, 0.57 psi is almost double to 0.30, and this is important because in Kellenberger, none of the AULs disclosed in Kellenberger meet the claims in Beyerle. The higher AULs disclosed in Kellenberger are only at 0.30 because that's where Kellenberger did his work. Wait a minute, but Kellenberger did say, I found what I was referring to earlier, 10,000 to 50,000 dynes per square centimeter, which equates to 0.145 to 0.725 psi, even a range that certainly includes 0.57 and even goes higher. So how is that not relevant to the disclosure of the AULs? None of the AUL higher than 0.30 meets Beyerle's claims. Wait a minute, none of the AUL higher than 0.30? None of the AUL that was measured at a pressure higher than 0.30 meets Beyerle's claims requiring both the AUL at 17 and the pressure at 0.57, and including a wicking index higher than 10. Those limitations go together. Well, when you say including a wicking index higher than 10, if it is inherent, okay, suppose that Kellenberger said... But it's not inherent. Suppose that Beyerle says AUL greater than 17, pressure 0.57. Suppose Kellenberger says, we suggest you use AUL of 18 at a pressure of 0.57. Suppose Kellenberger identically disclosed those two things, same SAMs. The only thing it does, suppose it never mentions the word wicking. In fact, wicking was not even a word in existence because your client invented all of it. Suppose that's the case. Do we then have inherent anticipation? We have the identical disclosed SAMs being disclosed. This is a hypothetical. I'm not suggesting this is what Kellenberger does. Just work with me. Kellenberger says AUL of 18, exactly like Beyerle, greater than 17, and PSI of 0.57, identically the same, same exact SAMs, but it makes no mention of the word wicking. What happens then? First of all, the evidence shows that the PTO did not make a prima facie case because it did not deal with the wicking index. In the original decision, wicking is a property. It's not a property, Your Honor. Wait, wait. When you choose a SAM and it has an AUL of 18 and a PSI of 0.57, are you able to bury the wicking? Your Honor, it's not an inherent property. I apologize. It's not an inherent property dependent on AUL. It is not dependent on AUL. No, it's dependent on the combination, right? The SAMs, the type of SAM used, the AUL, and the pressure. Isn't that what it's dependent on? And other variables that I may not know of here today because I'm not one of the ordinary people in the yard. But none of those are claimed. None of those other variables are claimed, right? The only thing that this claim contends with is the type of SAM, and the type of SAMs claimed in Beyerle, granted she discloses more than what she claims, but the type of SAMs claimed are identically disclosed in Kellenberger. No, they are not, Your Honor. They are not identically disclosed in Kellenberger. I don't want to get away from my hypothetical. I'm not understanding why Kellenberger would be discounted simply by virtue of not mentioning that this particular identical structure results in a wicking of 10. Are we on your hypothetical or are we answering the question you just asked? Well, I kind of think of them one and the same, but go ahead. They are different. Hypothetical is because the PTO did not make a prima facie case, but I think you want me to answer what happens if the PTO did make a prima facie case? Well, I guess what I'm trying to get at is, does their prima facie case, in your mind, have to include disclosure of wicking equals 10? No, it doesn't, because the identical or SAMs from the same chemical class do not behave similarly at all, and those of skill in the art know that. It's all based on how they're made, on the different cross-linkers, and on the different coatings. They're not closely related just because they have the same names. And, in fact, if you look at the SAMs disclosed in Byerly and the SAMs disclosed in Kellenberger, there's only one chemical name in common between the two. That's the starch-grafted cross-linked sodium salt of polyacrylic acid, and of those, none of the same names, the same manufacturer's designations, repeat themselves. So they're not the same SAMs. What are the SAMs that Byerly claims? That's in Table 1 at page... No, because her claim doesn't say Table 1, right? It says, her Claim 1 says... Okay, a group consisting of alkaline metal salts of... So you're saying to me that this group listing in her Claim 1 is not disclosed in Kellenberger? Those are the chemical classes, but you go down past the chemical classes and her claim is specific to a composite having 30% weight, super-absorbent, and an absorbency under load of 17 at .57, and a wicking index of 10. Those limitations are not met by any of the SAMs in Kellenberger. Well, how do we know that? Are you saying because Kellenberger didn't measure at the same points? Well, Kellenberger did measure at the same points, and if you look at Table B in Kellenberger at page 403 of the record, you see that there are two examples in Kellenberger, Example 1 and 2. I'm sorry, I'm not with you. Page 403 of the record. And page 403 of the record shows Examples 1 and 2, and another good place to look at Examples 1 and 2 is page 417 of the record. Are you there? Yes. So at page 403 of the record, you can see that when Kellenberger measures Example 1, I believe is a good example, at .30 it has an AUL of 26. When it measures at .56, it's gone down to 13. Right. And when it measures higher, it goes down to 8. And then you look at Example 1, and that example isn't a good example at all. What that shows, first of all, is that you can't predict AUL from a lower pressure to a higher pressure. Not exactly, but you can certainly anticipate it. You can just say that it goes down. The curve that will be asymptotic to the positive Y and positive X axis. But it's definitely not direct. It's not a direct relationship. It's not a straight line. You can't predict it. Well, page 417 shows the relationship, doesn't it? And it's a curve that's not predictable. Then another... Can you put an equation to those curves? That, Your Honor, I do not know. Well, here's what's frustrating about this. It sounds as if what you're saying that Byerly gets in Claim 1 is patent protection for any of a very broad range of SAMs, or broad range of absorbent composites containing a very broad range of SAMs that have these properties that get measured to have 10 centimeters of wicking index and 17 grams at 0.57. Even if neither she nor anybody else has yet actually made such a SAM. But the SAMs were made, and they're in her... No, but suppose I come up with a new SAM that is made generally of this material, but it's one that no one has ever made before, and it's really good, and it does better than any of the tested SAMs, and as a result, it's better for wicking, and it's better for AUL at a higher pressure. I'm foreclosed, right? Not from making the SAM, Your Honor, because the claim is to a diaper, an absorbent composite. I want the SAM so I can put it in the diaper. She's foreclosing me, correct? From making the absorbent composite. The specific one at that specific limitation, yes, Your Honor. Right. Okay. I'd like to ask you a question. On page 14 of your brief, you've got a photograph of two stacks of diapers. Yes. And the one on the left, I gather, was a diaper that was pre-Kellenberger. That's a Kellenberger diaper. Well, it was... A pre-Kellenberger diaper. Before Kellenberger. Okay. My question is, where does Kellenberger fit into this picture? Which of these stacks is he closest to? My understanding is that that was the diaper at the time of Kellenberger. But let me take a look. You're saying Kellenberger's on the left? That's Kellenberger? Yes. That's 1986. Kellenberger was 1988. So that was my understanding when we selected the pictures. And I can tell you why. If you look in Kellenberger, at page A400, Kellenberger describes the examples. And in the examples, Kellenberger says that all of the Kellenberger absorbent composites were made with 10% to 12% SAM. And that is in a patent that is incorporated by reference. Whereas Byerly discloses that all of her examples were made with 50% SAM. I see my time's run out. Thank you, Your Honor. We'll reserve a couple of minutes for rebuttal. Thank you. Mr. Stoll. May it please the Court. This case is a lot simpler than all the numbers in the graphs and in the briefs and in the claims suggest because Byerly has not invented a new superabsorbent material. She simply claimed a parameter for selecting commercially available, off-the-shelf superabsorbent material for selection in diaper materials. But that parameter is already disclosed in the prior art. Kellenberger teaches directs one of ordinary skill in the art to select superabsorbent materials based on their ability to absorb fluid, significant amounts of fluid, even under the weight of the infant. Now, as to wicking index, this is just an inherent property in Kellenberger's preferred superabsorbents. We know that because Table 1 that appellant cites to in her brief and that's shown on A389 in the appendix, that's the published version of her application. I'm at A389. Table 1 is at the top of the page in the left-hand column. And it lists out 13 superabsorbents that she's tested. And of the 7 superabsorbents that have an AUL of 13 or better, remember, Kellenberger starts off with an AUL of 13 as she just pointed out to you. Of the 7 superabsorbents that have an AUL of 13 or better, all 7 have a wicking index of 10 or better. In fact, it's higher than that. And if you go down to paragraph 28 at the bottom of that very same column, you'll see she characterizes this as an acceptable superabsorbent. She says, of the superabsorbent materials tested, those having an absorbency under load value of greater than about 13 are generally found to be acceptable performers. Those having AULs below 13 are not. So the only evidence in this record supports the examiner and the board's findings that this wicking index parameter, this inherent parameter of these superabsorbents that have very high AULs, relatively high AULs, are indeed inherent in the ones that Kellenberger recommends selecting. And by no means is Kellenberger limited to assessing superabsorbent performance at 0.3 psi. Indeed, as Judge Moore pointed out, he talks about babies of different weights, 0.17 psi all the way up to, I believe it's 0.7 psi. And then at A403. You've got to apply it just so I know. Is that discussion pertinent to the AUL greater than 24? Or is it divorced from? It's in conjunction with it. We take the reference in its entirety. And Kellenberger starts off at 24. Let me clarify that point as well. At A397, Kellenberger says 27. And I'll wait until you get there. At A397, I'm at line 6. Kellenberger talks about the results he got of measuring the superabsorbent sample that was just discussed with the panel's counsel. And he says AUL at 27 is generally acceptable. That's the minimum threshold. But he wants to go much higher than that. He says 29 is even better. And most preferred have at least 32. So we're pushing the slope of that curve we talked about in the figure up. So when we push it up from 26 to 29 to 32, we push Kellenberger's disclosure from 13 to some higher value, 16, 17, 18. Remember, this is an obviousness rejection. Kellenberger's defined a world of superabsorbents that meet his preferred criteria. And therefore, he's not limited his disclosure to the example tested, the 26-value superabsorbent, nor is he limited to pressures of 0.3. He had a theory. His theory was that if I can select superabsorbents that perform better under the weight of the infant, I'm going to be able to come up with a diaper that can absorb leaks throughout the entire night. And he appreciates the value of wicking. And by selecting these higher superabsorbents, these higher AUL superabsorbents, I'm going to take you back to... But he doesn't need to appreciate the value of wicking, right? He doesn't need. In order for there to be obviousness or even potentially anticipation if identical values were all disclosed. That's absolutely right. But the fact of the matter is he did recognize that for some reason when he put these higher AUL superabsorbents in his diaper material, the composite material performed better. He may not have recognized that the wicking was not only happening through the fibrous material. What about Mastady's argument, though, that it's not the same SAMs? Well, we don't know that it's not the same SAMs. But according to the board and the examiner, these are identical SAMs. He's carved out the same parameter for selecting these superabsorbents when he's carved out... So you're saying the board and the examiner made a finding of fact that these are the same SAMs. Absolutely. And that we would be bound by substantial evidence deference to overcome. Absolutely, Your Honor. When you see the board apply the case law, I believe it's on A16 through 18, they talk about NRA-BEST. They talk about the many cases that stand for the proposition that when the composite material appears to be identical to that claim, it's well within the PTO's authority. As you mentioned, the PTO lacks the ability to conduct the type of testing to prove that what appears to be the same composites are non-obvious variations. Indeed, in this case, this published document was a patent application to Kellenberger, owned by Kimberly-Clark, both this application and the Kellenberger reference. Mr. Kellenberger happens to be a named inventor on this very application, on Byerly's application. So here's a perfect example where the PTO properly shifted the burden and Ms. Byerly came back with no evidence to rebut the substantial evidence here that, indeed, one awarding skill in the art would be directed by Kellenberger to select these better-performing, higher-AUL superabsorbents and that the wicking index is merely a new term she's coined, a new test she's come up with to cover an inherent property in these superabsorbents. Let me ask you this. Suppose that Kellenberger didn't have any figures at all in testing information, but simply claimed the composites described in this generic fashion, composites made of the following materials and combinations thereof. And then Ms. Byerly came in and said, well, that's all well and good, but if you really want something to work well, what you will do is you will select from that large group that Kellenberger has outlined the following by these traits and identified three different traits, all of which, when maximized, will give you the most efficient composite. Now, do you think that that would be patentable subject matter if Kellenberger is the only prior reference? Well, that's not this case, but I think the test that you're suggesting would be if she's come up with a subset within Kellenberger that has unexpected results. Well, it's the genus-species type problem, but it is in the setting of someone who is characterizing the subset by this set of properties that was not previously recognized as pertinent to the question of efficacy, or at least wasn't measured in the prior article. Again, Your Honor, I think if there was some evidence that that subset within Kellenberger, that small subset within Kellenberger, performed radically differently from the general behavior of all the rest of the members of the class, then yes, that might be patentable. Here it seems that the overlap is identical. We have Biley setting the threshold at the same rate. And again, I just read from Biley's own application. She starts off at 13, and she says the values above that are acceptable. Now, she's claimed above that at 17, but Kellenberger's not limited to 13 either. He says, well, taking the pressure at the lower pressure, he says start off at 24, 26, 27, 32 plus, and he's by no means limited to the pressure. I want to read from Kellenberger when he discusses pressure at A4 of 3. And this is at line 12. He says, examples containing the relatively higher AUL perform a significantly higher and more consistent amount of work against an applied load up to about 1.0. Now, why is he talking about 1.0? Well, as Your Honor, Judge Moore mentioned earlier, we're worried about not just babies that weigh 10 pounds. That's an approximation I'm going to make for the 0.3 PSI. Biley's described the 0.57 PSI as corresponding to a 17-pound baby. But as we all know, kids were potty trained at different ages, and they have larger kids. These diapers go up to 3, 4s, and 5s, and the weights are higher. And so Kellenberger's not going to limit his invention to just the 10-pound baby. That makes no sense. That's a misreading of Kellenberger. More of the picture, Your Honor, Judge Cudahy asked about the photograph. As far as I'm concerned, I couldn't locate that anywhere in the record. I have no reason to believe that's a depiction of Kellenberger. The larger diapers are Kellenberger's versus Biley's. As a matter of fact, Kellenberger's disclosure was published in 1988. So I don't know where that supposed evidence comes from. I also want to point out that there are other issues in the case. The absorbent capacity, it appears that at A1053, having gone over some of the responses to the office actions, there's a statement in there that all superabsorbents have an absorbent capacity of 30 grams. I mean, the evidence just shows here that these superabsorbents disclosed by Kellenberger are identical. And if that's the case, or if they're substantially identical, the burden shifts the applicant to prove these features are non-inherent. She just simply has failed to do that here. I also think it's worth noting at the bottom of A402, in conjunction with figures 18 and 19, Kellenberger recognized that it's important to make sure that the composite material, and remember, Biley's claiming composite material, if they're the same superabsorbent put in the composite material, and Kellenberger's describing this composite material performance, the behavior's the same, we have a discussion of fluid wicking distance. We have a discussion of fluid uptake. All of this in the context of wicking. It sounds a lot like what she's talking about. It is in the context of the entire composite material. But the bottom line here is if it's obvious to go out and select these better performing, higher AUL superabsorbents, the rest of the properties are inherent. Unless there are any other questions, I'll yield the rest of my time. Thank you, Mr. Stoll. And Ms. Addy, we promised you a couple of minutes and we'll live by our promise. Thank you, Your Honors. Three points. First of all, I invite you to look at the disclosed superabsorbents in both disclosed superabsorbents. They do not overlap. They are entirely different. Hence, the PTO has not met its burden because SAMs that are different perform differently. Number two, there are no overlapping results. Just so I know, was there evidence introduced that SAMs that are different perform differently? Because the PTO failed to meet its burden. But they only failed to meet their burden if I believe you that the SAMs that are produced differently or slight differences in SAMs results in, and I mean, they're arguing obviously, not anticipation. So where do I come up with that idea? Because the PTO shifted the burden, there was evidence submitted that shows that you cannot predict AUL at a lower pressure. AUL at a lower pressure is not predictive as AUL at a higher pressure, and that's the Melius Declaration. In addition, if you look at the Kellenberger Disclosure at Table B, which is at 403 and Figure 17, you can tell that SAMs behave differently. Those are two SAMs that behave radically differently. You can also tell that from looking at Table 1 at Byerly. So while no separate evidence was presented, our position is, number one, a prima facie case wasn't properly made because the SAMs are different, and number two, the evidence is available in the record already. Point number three, well, point number two, there are no overlapping results because you cannot separate pressure and AUL. That simply can't be done. And the difference between an AUL at 13 and 17 is immense. Consider 4 grams per gram. In an insorbent composite containing 10 grams of SAM, that's 40 extra grams of fluid. That's an extra insult, a night. That's an extra, one less diaper, one less diaper to go in a landfill. That's a big deal between Kellenberger and Byerly. And finally, Kellenberger was doing it an entirely different way. Kellenberger was propping up SAM, Kellenberger was propping up the absorbent fibrous fluff network around the SAM. It was an entirely different way. Thank you, Your Honors. Thank you. Anything both counsel? The case is submitted.